UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **KENNY SAVOIE** | **CASE NO.  6:21-CV-01910** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **EMPIRE PETROLEUM CORP ET AL** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

## REPORT AND RECOMMENDATION

Before the Court is Thomas Pritchard's Renewed Motion to Dismiss for Lack of Personal Jurisdiction. (Rec. Doc. 57). Plaintiff, Kenny Savoie, opposed the motion (Rec. Doc. 61), and Pritchard replied (Rec. Doc. 66). The Motion was referred to the undersigned magistrate judge for review, report, and recommendation in accordance with the provisions of 28 U.S.C. §636 and the standing orders of this Court. Considering the evidence, the law, and the arguments of the parties, and for the reasons explained below, the Court recommends that Pritchard's motion be granted.

### Factual and Procedural Background

Kenny Savoie filed this suit for breach of contract and unpaid wages against Empire Petroleum Corp., Pritchard Energy Advisors, LLC ("PGA")[1], and Thomas Pritchard (PGA's Chief Executive Officer, member, and co-founder) in July 2021.

---

[1] The parties refer to Pritchard Energy Advisors, LLC as "doing business as Pritchard Griffin Advisors," hence abbreviated as "PGA."

Savoie contends Defendants failed to pay him commissions and wages as required by their contractual agreements regarding Savoie's work to secure upstream oil and gas opportunities. (Rec. Doc. 1). Initially, Pritchard and PGA filed separate motions to dismiss for lack of jurisdiction.[2] After consideration of the parties' competing evidence, the Court was unable to determine whether jurisdiction existed over Pritchard and PGA and dismissed the motions without prejudice allowing the parties to conduct jurisdictional discovery to resolve the issue. (Rec. Doc. 46). Having completed that discovery, Pritchard now re-urges his motion to dismiss for lack of personal jurisdiction.[3]

## Law and Analysis

In the interest of efficiency, the Court incorporates by reference its previous ruling, which discussed the law applicable to Rule 12(b)(1) motions to dismiss and personal jurisdiction. (Rec. Doc. 46, p. 3-7). In short, the plaintiff bears the burden of establishing jurisdiction by presentation of facts sufficient to constitute a *prima facie* case of personal jurisdiction, with factual conflicts resolved in the plaintiff's favor. *Luv N'care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006). To determine whether the Court may exercise personal jurisdiction over Pritchard, a

---

[2] Pritchard also filed a motion to dismiss pursuant to F.R.C.P. Rule 12(b)(6); however, the Court dismissed the motion without prejudice pending a ruling on jurisdiction. See Rec. Doc. 46.

[3] PGA did not re-urge its motion to dismiss for lack of jurisdiction. The Court assumes PGA no longer contests jurisdiction.

2

domiciliary of Virginia, the Court must determine whether Pritchard has sufficient minimum contacts with Louisiana. Under the minimum contacts inquiry, general jurisdiction may exist where there are continuous and systematic contacts between the defendant and the forum. *Id*. Specific jurisdiction, which focuses on the dispute at issue, is a three-step inquiry: 1) Has the defendant purposefully directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there? 2) Does the plaintiff's cause of action arise out of or result from the defendant's contacts with the forum? 3) If the plaintiff satisfies the first two prongs, the burden shifts to the defendant to defeat jurisdiction by showing that the forum state's exercise of jurisdiction would be unfair or unreasonable. *Id*. Specific jurisdiction is the issue in this case.

Jurisdictional discovery having been done, the parties do not dispute either that the Court has jurisdiction over PGA or that Pritchard's suit-related Louisiana contacts have been in his capacity as PGA's officer, rather than in his individual capacity. Pritchard asserts the fiduciary shield doctrine precludes a finding of specific jurisdiction. The general rule of the fiduciary shield doctrine is that "jurisdiction over an individual cannot be predicated upon jurisdiction over a corporation." *Stuart v. Spademan*, 772 F.2d 1185, 1197 (5th Cir. 1985). Two exceptions to the fiduciary shield doctrine potentially expose a corporate officer to jurisdiction otherwise existing over the entity. The first exception is when the court

pierces the corporate veil, such as "when the corporation is the alter ego of the individual," to reach the individual shareholder. *Id*. Second, the fiduciary shield doctrine does not apply where the plaintiff's claims rest upon allegations that the individual defendant is personally guilty of tortious conduct. *Lewis v. Fresne*, 252 F.3d 352, 359, fn. 6 (5th Cir. 2001). Hence, Pritchard, whose identity as PGA's corporate officer is the undisputed basis of his defendant status, is not subject to personal jurisdiction unless Savoie shows either that 1) Pritchard was PGA's alter ego or is otherwise liable under corporate veil piercing doctrines, or 2) Pritchard is personally liable for individual tortious conduct such as engaging in conflicts of interest, fraud, or interference with contract.

## I. Alter Ego and Piercing the Corporate Veil.

Pritchard argues primarily that Savoie has not shown that he (Pritchard) was PGA's alter ego or is otherwise personally liable through piercing PGA's corporate veil. Initially, the Court must determine which state's corporate veil-piercing law applies. "It is axiomatic that in diversity cases, a federal court must follow the choice-of-law rules of the state in which it sits." *Stuart*, 772 F.2d at 1195. Louisiana would most likely apply the law of the state of incorporation to determine when to pierce a corporate veil. *Patin v. Thoroughbred Power Boats Inc.,* 294 F.3d 640, 647 (5th Cir. 2002). PGA is a Texas limited liability company domiciled in Texas and Virginia. See Rec. Doc. 24-3, ¶3; 6. Thus, the Court must

4

apply Texas law to determine whether Pritchard is personally liable as PGA's alter ego or as the personally liable member behind PGA's corporate veil. Texas Business Organizations Code §21.223 states:

(a) A [beneficial owner] may not be held liable to the corporation or its obligees with respect to:

\*\*\*
  2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, beneficial owner, subscriber, or affiliate is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory; or

(b) Subsection (a)(2) does not prevent or limit the liability of a … beneficial owner … if the obligee demonstrates that the … beneficial owner … caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate.

Tex. Bus. Orgs. Code Ann. § 21.223.

A business owner's limited liability is "exclusive and preempts any other liability imposed for that obligation under common law or otherwise." Tex. Bus. Orgs. Code Ann. § 21.224. The Fifth Circuit recognizes the foregoing exclusive limited liability of business owners:

> The fundamental concept of corporate law is that the corporation is a wholly separate, legal entity. As such, the corporation, and not its shareholders, is liable for its own debts and torts. *Krivo Indus. Supply Co. v. National Distillers and Chem. Corp.,* 483 F.2d 1098, 1102–03 (5th Cir.1973). Nonetheless, under Texas law, courts do not hesitate to ignore the corporate form when it "has been used as part of a basically unfair device to achieve an inequitable result." *Castleberry v. Branscum,* 721 S.W.2d 270, 271 (Tex.1986).

*W. Horizontal Drilling, Inc. v. Jonnet Energy Corp.,* 11 F.3d 65, 67–68 (5th Cir. 1994).

In interpreting Texas's landmark case, *Castleberry v. Branscum*, the Fifth Circuit established "three broad categories [under Texas law] in which a court may pierce a corporate veil: (1) the corporation is the alter ego of its owners and/or shareholders; (2) the corporation is used for illegal purposes; and (3) the corporation is used as a sham to perpetrate a fraud." *Id*. at 67 (citations omitted). Under Texas law, *"*[v]eil-piercing and 'alter ego' principles apply equally to corporations and LLCs. *Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 443 (5th Cir. 2013).

### A. <u>Alter Ego.</u>

Under *Castleberry*, alter ego occurs when "a corporation is organized and operated as a mere tool or business conduit of another corporation." *W. Horizontal Drilling, Inc.,* 11 F.3d at 68 (citations omitted). To determine whether an individual is an alter ego of a corporation in a contract claim, the court should consider the total dealings of the corporation and the individual, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes. *Id.* See also *Gundle Lining Const. Corp. v. Adams Cnty. Asphalt, Inc.,* 85 F.3d 201, 208–09 (5th Cir. 1996).

Savoie presented no evidence that PGA was Pritchard's alter ego, such as whether he used PGA for personal purposes or commingled his personal assets and accounts with those of PGA. Additionally, no evidence suggests that Pritchard used PGA as a conduit of another corporation. Indeed, Savoie alleges that Pritchard essentially ignored PGA in favor of Empire. (See Rec. Doc. 1, ¶18; 22; 28). Thus, Pritchard is not subject to jurisdiction as an alter ego of PGA.

### B. Piercing the Corporate Veil through Fraud.

Absent evidence supporting an alter ego theory, Savoie contends Pritchard's alleged fraud warrants piercing the corporate veil. Fraudulent conduct may warrant veil piercing under the sham-to-perpetuate fraud theory or, as briefly discussed below, as an independent basis for individual liability. In the context of veil piercing, the nature of the plaintiff's claims as either contract or tort dictate the standard by which his veil-piercing claims are adjudged.

> To pierce the corporate veil in contract claims, actual fraud must be proven. The amendments preserved the right to use either actual or constructive fraud to pierce the corporate veil in *tort* claims.

*W. Horizontal Drilling,* 11 F.3d at 68, fn. 4 (emphasis in original). See also *Ledford v. Keen*, 9 F.4th 335, 339 (5th Cir. 2021).

One court further explained:

> Whether a plaintiff may pierce an entity's veil pursuant to either the alter ego theory or the sham to perpetrate a fraud theory depends on whether the plaintiff's claims sound in tort or contract. Whereas a tort claimant may freely pierce the veil under either of these theories,

> a contract claimant may only pierce the veil if the defendant has also committed an actual fraud against the plaintiff for the defendant's direct personal benefit. That is, the contract claimant must show that the "holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an *actual fraud* on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate." Tex. Bus. Orgs. Code § 21.223(b).

*AHBP LLC v. Lynd Co.*, No. SA-22-CV-00096-XR, 2023 WL 139149, at *5 (W.D. Tex. Jan. 9, 2023) (emphasis in original). See also *Sparling v. Doyle*, No. EP-13-CV-00323-DCG, 2014 WL 12489990, at *5 (W.D. Tex. Oct. 23, 2014), noting that Texas courts "have generally been less reluctant to disregard the corporate entity in tort cases than in breach of contract cases." The distinction is well-founded, because "contract claimants, unlike most third parties suing in tort, have voluntarily chosen to deal with the corporation and, '[a]bsent some deception or fraud,' would have had the opportunity to apportion, through negotiated contract terms, the risk that the entity would be unable to meet its obligations." *Belliveau v. Barco, Inc.,* 987 F.3d 122, 130 (5th Cir. 2021) quoting *Shook v. Walden*, 368 S.W.3d 604, 620 (Tex. App.—Austin 2012, pet. denied).

The Complaint does not assert any tort claims against Pritchard. Savoie's claims against Pritchard sound in contract. He asserts a claim based on PGA's alleged breach of contract (Cause of Action 3) and for violations of the Louisiana Wage Payment statute (Cause of Action 4). Louisiana wage payment claims are contract-based claims. *Grabert v. Iberia Par. Sch. Bd.,* 93-2715 (La. 7/5/94), 638

8

So. 2d 645, 647 ("[V]irtually all claims for wages arise out of breach of a contract, oral or written, to pay wages for services rendered.") Hence, he must show actual fraud in order to pierce PGA's corporate veil and hale Pritchard personally into court.

The standard for actual fraud in the context of this contract-based case is as follows:

> In the veil-piercing context, Texas courts have held that actual fraud is not equivalent to the tort of fraud. Some courts have held, for instance, that proving a material misrepresentation may not be required—even in connection with contractually originated claims. ***Rather, actual fraud involves dishonesty of purpose or intent to deceive and is characterized by deliberately misleading conduct.*** Because direct evidence of actual fraud is scarce, courts may deduce fraudulent intent from all of the facts and circumstances. This court has emphasized the overall purpose of the statute, however, to strike a balance in economic regulation between contract claimants, who may protect themselves *ex ante,* and tort claimants who have no such opportunity.

*Belliveau,* 987 F.3d at 129 (5th Cir. 2021) (cleaned up) (emphasis added).

Therefore, if Savoie shows that Pritchard perpetrated actual fraud for his direct and personal benefit, the Court may pierce PGA's corporate veil to exercise jurisdiction over Pritchard. The parties involved in this case are sophisticated businessmen and investment bankers who make money by cultivating deals in the oil and gas industry. PGA was initially an LLC owned by Pritchard and non-party Ken Griffin. Empire is now an apparently successful publicly traded company, though Savoie contends its success was at his expense.

9

PGA's purpose was to raise capital for oil and gas companies looking to purchase certain properties. (Rec. Doc. 61-1, p. 11 [Depo. P. 41-42]). Empire was one such client which engaged PGA in 2016 for the purpose of purchasing a Texas asset. (Rec. Doc. 61-1, p. 12 [Depo. P. 47]; PGA–Empire Contract at Rec. Doc. 61-2, p. 44-46). The PGA–Empire contract provided that PGA would assist Empire to obtain approximately $20 million in capital (referred to as "Transaction") required to acquire 50% of Masterson West, LLC. In exchange, Empire would pay PGA a monthly consulting fee of $14,000/month, reimbursement of expenses, and upon a closing, a success fee of 5% of investor funds received, and upon completion of "the Transaction," common stock equivalent to 5% of total raised. The term of the agreement was six months, with renewal provisions and a provision which obligated Empire to pay PGA the success fee on "(i) any Transaction (as defined herein) occurring after the date of termination [and which] closes within twelve months … after the date of termination; or (ii) any Transaction occurring after the date of termination provided that such acquisition closes within [12 months] with funding provided by a source previously contacted…" (*Id.*) The anticipated acquisition of Masterson West never materialized. (Pritchard testimony at Rec. Doc. 61-1, p. 21 [Depo. P. 81-82]; p. 35 [Depo. P. 139]; Savoie testimony at Rec. Doc. 57-1, p. 27 [Depo. P. 102-105]).

In July 2017, PGA contracted with Savoie, an experienced geologist and executive, to develop upstream oil and gas opportunities. (Rec. Doc. 1, ¶8; 10-11). In exchange for his work in developing upstream oil and gas opportunities, Savoie was to receive:

- "90/10 split in your favor on upstream deal revenues on projects that you originate until you have earned $150K; 60/40 split in the firm's favor after you have earned $150K in any given year

- 60/40 split in your favor on upstream deal revenues on projects that you do NOT originate until you have earned $150K; 70/30 split in the firm's favor after you have earned $150K

- 10% commission on fees from non-upstream projects that you originate or refer"

(Rec. Doc. 57-3, p. 1).

While working for PGA between July 2017 and September 2018, Savoie alleges he received no salary or commissions. Pritchard allegedly told Savoie during that time this was because Savoie had not yet closed any deals for PGA, and that they "…eat what we kill." (Rec. Doc. 1, ¶12).

In July 2018, Empire and PGA allegedly amended their contract to encompass "all capital raised or assets contributed as a result of Pritchard['s] efforts." (Rec. Doc. 1, ¶13). There are factual disputes about whether the PGA-Empire contract applied to any transactions other than the anticipated Masterson West acquisition and whether the contract was actually amended. (Compare Savoie testimony at Rec. Do. 57-4, p. 28-33 [Depo. P. 107-129] and Pritchard testimony at

Rec. Doc. 61-1, p. 15 [Depo. P. 59-60]). Thereafter, in September 2018, Savoie and Empire entered into an employment contract in which he was engaged as Vice President of Operations and to receive a base salary of $100,000, annual bonuses to be determined, and warrants to purchase 300,000 common shares of stock at $.017/share. (Rec. Doc. 1, ¶15; Rec. Doc. 57-5).

While thus employed by Empire, Savoie continued working on behalf of PGA. The work required was to the same end (acquiring assets for Empire) regardless of which hat—Empire or PGA—he was wearing. (Rec. Doc. 57-4, p. 53-54 [Depo. P. 208-213]). Empire paid Savoie his agreed upon salary and stock warrants. (Savoie testimony Rec. Doc. 57-4, p. 52 [Depo. P. 204]; p. 55 [Depo. P. 216]). Empire terminated Savoie in April 2019 after a heated email exchange. (Rec. Doc. 1, ¶19; Rec. Doc. 57-4, p. 70-71 [Depo. P. 277-81]).

After his termination from Empire, Savoie followed up with Pritchard regarding the commissions he had allegedly earned while working for PGA. Savoie alleges that on July 10, 2019, Pritchard "responded and stated, falsely, that PGA did not receive any compensation on the projects listed and therefore did not owe any compensation to Mr. Savoie." (Rec. Doc. 1, ¶18). The Complaint further alleges that Pritchard "[p]ersonally engaged in fraudulent and deceitful conduct by informing Mr. Savoie that PGA had not received any retainer money or any payments on Mr. Savoie's projects, and that Mr. Savoie was therefore not entitled

to any compensation." (Rec. Doc. 1, ¶28). However, Savoie contends that in reality, although PGA did not receive success fees, PGA did receive retainer fees from Empire, a portion of which he claims to be entitled based on the PGA–Empire contract. (Rec. Doc. 1, ¶18).

The primary basis for Savoie's contention that Pritchard lied about PGA not getting paid is the above-mentioned 2019 email exchange between Savoie and Pritchard after Empire had terminated Savoie. (Rec. Doc. 57-4, p. 60 [Depo. P. 234-35]; p.72 [Depo. P. 284-85]). In response to Savoie's email seeking "retainer fees and commissions" per his employment agreement with PGA, Pritchard stated:

> Thank you for the email. PGA, as an investment banking organization, strives to create fair remuneration arrangements with its associates and employees and to honor those arrangements. We have reviewed your email and we do not agree with your interpretation that compensation that [sic] may have been due to you. For instance, our arrangements with you were clearly predicated on PGA's receipt of compensation. In essence, PGA did not receive compensation on the projects that you have asserted and, as such, PGA does not owe compensation to you or anyone else for that matter. Thank you and let me know if we can be of service to you or one of your organizations.

(Rec. Doc. 61-2, p. 140).

The foregoing July 10, 2019 email upon which Savoie's claim of fraud rests confirms the fact that the parties have operated on different interpretations and iterations of the same contract (the PGA–Empire contract), executed before Savoie was involved with PGA and to which Savoie was not privy. (Compare e.g. Savoie testimony at Rec. Doc. 57-4, p. 16 [Depo. P. 59-61]; p. 26-27 [Depo. P. 98-102]

13

and Pritchard testimony at Rec. Doc. 61-1, p. 22 [Depo. P. 86] and p. 26 [Depo. P. 102]; and further compare e.g. Savoie testimony at Rec. Do. 57-4, p. 28-33 [Depo. P. 107-129] and Pritchard testimony at Rec. Doc. 61-1, p. 15-16 [Depo. P. 59-60-62]). In other words, the parties disagree about whether the PGA–Empire contract entitled PGA to collect certain fees and whether Savoie's contract with PGA would warrant collection based on the Empire contract. Having considered the 2019 email, both Savoie and Pritchard's extensive testimonies, and all the evidence submitted, the Court is not convinced Savoie can show Pritchard engaged in actual fraud at the relevant time. Rather, the evidence shows that sophisticated investment bankers engaged in high-stakes deal-making as they attempted to build Empire in exchange for an expected future payoff. That they disagreed *post hoc* about application and interpretation of the relevant contracts does not amount to a showing of fraud.

Pritchard frames the issue as one of causation, arguing that his July 2019, post-termination email cannot serve the basis for a claim based on a pre-existing alleged breach of contract. He cites several cases for the proposition that a claim for fraud cannot be based upon lies allegedly told after the contract was formed. (Rec. Doc. 57-1, p. 22-23). See e.g. *Chico Auto Parts & Serv., Inc. v. Crockett*, 512

14

S.W.3d 560, 573 (Tex. App. 2017).[4] This argument is logical and persuasive. Veil-piercing based on fraud is intended to reach shareholders who lied in order to perpetrate a fraud through the entity (i.e. before or at the time of the contract). In this case, Savoie claims that Pritchard lied after the fact. Thus, even if the July 10, 2019 email could be considered fraudulent (which the Court does not find), the purported lie does not support a veil-piercing claim for actual fraud in this case.

In addition to Pritchard's July 2019 email, Savoie relies upon two other purported lies. First, he testified that Pritchard lied about how much he (Pritchard) was earning from Empire. (Rec. Doc. 57-4, p. 53 [Depo. P. 206]; p. 61 [Depo. P. 239-40). Even assuming the fact as true, the lie is not attributable to Pritchard as a PGA shareholder and the Court finds that any such lie is irrelevant to whether PGA breached its contract with Savoie.

Savoie further claims that Pritchard purposefully prevented Empire from paying PGA (which under his interpretation would have trickled down to Savoie via his own agreement with PGA), but he supports these claims with only speculation. He testified that he *assumed* it was Pritchard's decision to keep Empire from paying PGA based solely on Pritchard's position as Empire's CEO.

---

[4] "Chico's fraud allegations have nothing to do with Chico's claim for breach of contract. Instead the fraud as alleged by Chico relates solely to the allegation that Crockett made misrepresentations *after* the contract was formed with regard to which entity Chico should invoice. In fact, Chico never alleged that Crockett committed any fraud in the formation of the contract, or that Crockett used Black Strata to fraudulently induce Chico into entering into the alleged contract or that Crockett otherwise used Black Strata to perpetrate any fraud on Chico." (Emphasis in original).

He offered no evidence in support. (Rec. Doc. 57-4, p. 35 [Depo. P. 135-36]; p. 44 [Depo. P. 172-73]; p. 57 [Depo. P. 224-25]). Neither did he offer any evidence to contradict that Pritchard had attempted to get Empire to pay PGA, but that Empire, through other directors, decided not to pay PGA. (Rec. Doc. 57-4, p. 41 [Depo. P. 161]. In any event, Pritchard's alleged conduct in this regard would have been while wearing his Empire hat.

Further, Savoie has not shown that Pritchard purportedly lied for his direct and personal benefit. "While 'primarily for the direct personal benefit' of the individual is not defined, most cases finding the requirement to have been met had evidence showing that 'funds derived from the corporations' allegedly fraudulent conduct were pocketed by or diverted to the individual defendant.'" *Bates Energy Oil & Gas v. Complete Oilfield Servs.*, 361 F. Supp. 3d 633, 673 (W.D. Tex. 2019), citing *Hong v. Havey*, 551 S.W.3d 875, 885 (Tex. App. 2018) (listing cases). Savoie agreed that Empire—not Pritchard—benefitted from Empire's decision to not pay PGA. (Rec. Doc. 57-4, p. 67-68 [Depo. P. 264-67]). He offered no evidence to show that Pritchard received any personal and direct benefit as a result of his alleged lies.

The purported lies Savoie attributes to Pritchard illustrate the confusion wrought by both Pritchard and Savoie wearing both PGA and Empire hats throughout their course of dealings. It is thus easy to misjudge who was doing what

on behalf of whom at which times. The salient question is whether Pritchard engaged in actual fraud through or on behalf of PGA for his direct and personal benefit. For the above reasons, the Court finds Savoie has failed to meet his burden to show actual fraud sufficient to pierce PGA's corporate veil.

## II. Pritchard's personal liability.

In addition to the corporate veil theories discussed above, Savoie asserts Pritchard is individually liable for engaging in a conflict of interest, tortious conduct, and contract interference. See *Lewis v. Fresne*, 252 F.3d at fn. 6, discussing exception to the fiduciary shield doctrine for individual liability. Savoie's conflict of interest allegations are subsumed by the veil piercing and fraud analyses above. The Court appreciates no independent claim for conflict of interest other than arguably as a mechanism of showing fraud in the veil piercing context or as evidence pertaining to breach of fiduciary duties, which is not an issue in this case. Otherwise, Savoie's remaining contentions, including those regarding interference with contract and fraud (of the tortious variety), evoke tort liability;[5] however, the Complaint does not assert any tort claims against Pritchard

---

[5] Regarding tortious interference with contract claims, see e.g. *WickFire, L.L.C. v. Laura Woodruff; TriMax Media, L.L.C.,* 989 F.3d 343, 353 (5th Cir. 2021), *as revised* (Mar. 2, 2021) and *Homoki v. Conversion Servs., Inc.,* 717 F.3d 388, 396 (5th Cir. 2013).

individually.[6] Indeed, as Pritchard pointed out, Savoie clarified in a previous brief that he "does not assert that Defendant Pritchard is independently liable for his own tortious conduct. Rather, he asserts that Defendant Pritchard is liable for Defendant PGA's obligation because there are sufficient allegations to justify piercing the corporate veil." (Rec. Doc. 38, p. 3). Of course, the Court found insufficient evidence to pierce PGA's veil. The Court cannot exercise jurisdiction over Pritchard for non-asserted claims of individual liability.

## Conclusion

For the reasons discussed herein, the Court recommends that Thomas Pritchard's Renewed Motion to Dismiss for Lack of Personal Jurisdiction (Rec. Doc. 57) be GRANTED and that Thomas Pritchard be dismissed for lack of personal jurisdiction.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after being served with of a copy of any objections or responses to the district judge at the time of filing.

---

[6] Neither could Savoie sustain a claim for personal breach of contract against Pritchard, who was not a party to Savoie's contract with PGA. Pritchard's purported liability exists only on the other side of PGA's corporate veil.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. §636(b)(1).

THUS DONE in Chambers, Lafayette, Louisiana on this 15th day of May, 2023.

_____
CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE